

**THE SECRETARY OF HEALTH AND HUMAN SERVICES**
WASHINGTON, D.C. 20201

APR – 8 2005

The Honorable Max S. Baucus
Ranking Member, Committee on Finance
United States Senate
Washington, DC 20510-4103

Dear Senator Baucus:

Thank you for your letter regarding the transfer of responsibility for Medicare appeals as mandated by section 931 of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA). In the Plan for the Transfer of Responsibility for Medicare Appeals (Transfer Plan) that then-Secretary Thompson and Commissioner Barnhart submitted to the Congress on March 4, 2004, the two agencies stated their commitment to working together to ensure a successful transition and the availability of an efficient and effective appeals process both during the transition process and after the transition of responsibility for these Medicare appeals is complete. This is a commitment that I embraced on becoming Secretary.

In addition, the FY 2006 President's Budget request includes $80 million to support the new Office of Medicare Hearings & Appeals. These resources are critical to achieving our mutual goal of providing seamless service to our customers as the Medicare appeals function transfers from SSA to HHS. I hope that we can count on you to support us in this request.

In your letter you request additional details on a number of important matters relating to establishing the new organizational entity within HHS. I am enclosing information on your areas of concern. Commissioner Barnhart has already responded to your questions.

We appreciate the opportunity to provide this information to you and your staff. You may rest assured that both the Commissioner and I are working diligently and cooperatively to accomplish this important task. Please call me if you have additional thoughts or questions. I am also sending this response to Senator Grassley.

Sincerely,

Michael O. Leavitt

Enclosures



**THE SECRETARY OF HEALTH AND HUMAN SERVICES**
WASHINGTON, D.C. 20201

The Honorable Charles E. Grassley                    **APR – 8 2005**
Chairman, Committee on Finance
United States Senate
Washington, DC 20510-4103

Dear Chairman Grassley:

Thank you for your letter regarding the transfer of responsibility for Medicare appeals as
mandated by section 931 of the Medicare Prescription Drug, Improvement, and
Modernization Act of 2003 (MMA). In the Plan for the Transfer of Responsibility for
Medicare Appeals (Transfer Plan) that then-Secretary Thompson and Commissioner
Barnhart submitted to the Congress on March 4, 2004, the two agencies stated their
commitment to working together to ensure a successful transition and the availability of
an efficient and effective appeals process both during the transition process and after the
transition of responsibility for these Medicare appeals is complete. This is a commitment
that I embraced on becoming Secretary.

In addition, the FY 2006 President's Budget request includes $80 million to support the
new Office of Medicare Hearings & Appeals. These resources are critical to achieving
our mutual goal of providing seamless service to our customers as the Medicare appeals
function transfers from SSA to HHS. I hope that we can count on you to support us in
this request.

In your letter you request additional details on a number of important matters relating to
establishing the new organizational entity within HHS. I am enclosing information on
your areas of concern. Commissioner Barnhart has already responded to your questions.

We appreciate the opportunity to provide this information to you and your staff. You
may rest assured that both the Commissioner and I are working diligently and
cooperatively to accomplish this important task. Please call me if you have additional
thoughts or questions. I am also sending this response to Senator Baucus.

                        Sincerely,

                        Michael O. Leavitt

Enclosures

Detailed Response to
Senator Grassley's and Senator Baucus' Letter of March 25, 2005

The following provides detailed responses to the questions you raised in your
March 25, 2005 letter. You asked that the Department address several areas
including: 1) the number and location of field offices, 2) the progress we have
made in regard to the availability and operations of VTC, 3) the staffing of the
field offices and the headquarters office, 4) the supervisory roles of the ALJ
position, 5) the training of ALJs, and 6) the policies and procedures to provide
managerial and administrative support for the Medicare appeals process.

We would like to emphasize that in excess of 90% of all appellants are providers
or hospitals, rather than individual Medicare beneficiaries. This is consistent with
the 1999 Report from the Office of Inspector General
(http://oig.hhs.gov/oei/reports/oei-04-97-00160.pdf) indicating that the appeals
process is no longer a process predominantly for individual beneficiaries, but
rather a provider dominated process. HHS believes that access to hearings for
appellants who are elderly or disabled will be as good as or better than the
current access under SSA. Not only will access be available via
videoconferencing at SSA sites, and many other locations (which may be much
more convenient than the current limited number of SSA locations), but also
beneficiaries will continue to be able to request, and in appropriate
circumstances, obtain in-person hearings.

With the creation of the Office of Medicare Hearings and Appeals, HHS is
improving the hearings process by expanding access. SSA has over 1,100
administrative law judges (ALJs) in over 300 locations around the country who
hear both Medicare and SSA disability cases. HHS anticipates hiring
approximately 50 ALJs in FY 2005, based on the workload of Medicare cases
constituting only 11% of the total SSA ALJ workload. Therefore, it was apparent
that HHS would require a lesser physical geographic distribution than is currently
the case at SSA. However, the Department is committed to ensuring access as
good as or better than SSA's 300 physical buildings. Traditionally, access to
services was tied to physical buildings. HHS, knowing that it was not
economically or administratively feasible to have a large scale physical bricks
and mortar presence, as was traditionally the definition of access, took a state-of-
the-art approach to access and started examining ways in which we could bring
services to appellants, rather than making appellants go to the organization's
locations. The MMA legislation had suggested that HHS consider the feasibility of
access to ALJs via 'conducting hearings using tele- or video-conference
technologies'. HHS plans extensive use of VTC that will allow hearings to be
provided more timely with vastly more access points than SSA currently provides
through its offices. This technology, now commonly used in the medical
community with patients (telemedicine), and in courtrooms throughout the
country, will become the foundation upon which HHS will be able to meet the

1

BIPA timeframes and provide access equal to or better than is currently available. HHS will achieve these improvements in access through office locations established as 'coordinating hubs' or field offices, rather than through the Department owning buildings to which appellants travel. The criteria for selecting the number and location of offices then focused on: the management efficiencies that could be gained from shared administrative resources to support these field offices; equal distribution of the case workload among the field offices; and location of the field offices in cities with significant concentrations of appeals and/or are geographically central with convenient airports, for those cases that would still require the judge or appellants to travel.

Regardless of the geographic locations HHS chose, we expect the ALJs will still have to travel to hear some cases. Each of the field offices will have videoconferencing equipment, but not all cases will be able to use videoconferencing. Even with their numerous locations, SSA ALJs still travel a great deal to more remote locations to hear cases.

The new HHS locations are organized with the boundaries of HHS's existing geographic regions in mind. Medicare contractors and providers are very familiar with the HHS regional structure.

1. With respect to your questions regarding the geographic location of the Office of Medicare Hearings and Appeals Offices (OMHA), the plan for the Medicare Hearings is to have the ALJs located in four field offices in Cleveland, OH; Miami, FL; Irvine, CA; and Arlington, VA. In addition to being a field office, Arlington will also be the OMHA central office location.

Our choice of 4 field offices was based on the premise that we wanted to set the number of offices at a level such that we would have a cohesive group of ALJs at each location. We also knew that setting up too many offices would be expensive and likely to lead to delays in getting the new HHS appeals function operational by July 1. The typical process for opening new physical office space often is very lengthy. We didn't have that long, and needed to set up the physical space much more quickly than is typically done. Limiting the offices meant that we could concentrate those efforts on a manageable number of sites. Additionally, having fewer offices is more cost effective in terms of management, technology and training. We also knew that it would be much easier to start up new offices in the future when we had a better sense of the workload, including the new workload from Part D, than it would be to eliminate offices and move personnel.

When we examined data from CMS contractors as to how many cases came from each region, we noticed that there was a disparity between the regions in terms of how many cases each region produced. Regions 4 and 6 produced the most cases. Those two regions produced almost the same number of cases as

Regions 1, 2, 3, and 5 combined, and slightly more than Regions 7, 8, 9, and 10 combined. We realized that if we used those groupings of regions, we could establish offices of approximately 15 ALJs in each of those three field offices to manage the estimated workload. Offices with multiple ALJs meant that HHS could achieve efficiencies in training, space utilization, and technology utilization. We considered placing the field offices in the HHS regional office headquarters cities, such as Chicago, Boston, Atlanta, Dallas, or Kansas City. However we realized that by placing the OMHA offices in non-regional office headquarters sites, we could increase the total access for appellants to HHS, because appellants would be able to utilize the available videoconferencing equipment at HHS offices in each of those regional headquarter sites, in addition to in-person access at the new OMHA Field Offices.

To choose the cities for each field office, we examined data on case distribution from SSA. The SSA data showed that in Regions 4 and 6, the most cases were heard in Florida, particularly in Southern Florida, with the most cases being heard in Miami. For Regions 7, 8, 9, and 10, the SSA data showed that the most cases were being heard in California and Arizona, so from a geographic perspective we decided to place the field office in Southern California (Irvine), which closely aligned with both these states. For Regions 1, 2, 3 and 5, there was no one area that had the overwhelming majority of cases, so we placed the OMHA Field Office at the approximate geographic center of the regions, in Cleveland, OH. The OMHA Field Office in Arlington, VA will be smaller than the three larger Field Offices and serve the Washington, DC metro area, and also provide flexibility for the entire country by assisting other regions as needed with caseload, a critical contingency to meet the mandated 90-day processing timeframe of BIPA.

Your letter mentions that some SSA data and HHS data on regional distribution of cases conflict. There are many possible reasons for this conflict. CMS contractors and SSA do not count cases in the same manner. Additionally, the CMS data records the regions where the cases originate, while the SSA data records where a case was heard, which may be influenced by the location of a Medicare cadre judge or the lawyer for the appellant.

Furthermore, HHS is committed to reexamining the geographic distribution of offices after a year of operation. At that point we will have more information on how cases are coming in geographically.

2: With respect to your questions regarding use of video teleconferencing (VTC) for hearings, as mentioned above, VTC provides the mechanism to allow the Department to hear cases within the 90-day timeframe, providing appellants with timely hearings, conducted efficiently and effectively. Currently, video teleconferencing equipment is widely available and used extensively throughout the United States via several entities including SSA, other government agencies, private sector vendors, and law firms representing appellants. The use of VTC is prevalent not only in the legal realm, but also in the healthcare arena and other

3

areas where spanning geographic distance to meet the needs of customers (e.g., appellants, patients) is critical and time-sensitive. VTC equipment is widely available in law firms. As noted earlier, in excess of 90% of Medicare appeals come from providers, many of whom used private law firms that already have their own VTC equipment. HHS recognizes that for a small number of beneficiary appellants, VTC may not be appropriate and OMHA has made provision for hearings to involve ALJ travel to a location near the beneficiary. However, even SSA does not travel to the home-city of every appellant, thus, there are times when beneficiary will need to travel to another city where the judge may hear several cases from the surrounding area in one of the SSA office locations. HHS's goal is to use VTC to eliminate the need for an aged or disabled beneficiary to travel to another city if VTC is available closer to their home. When appropriate, the HHS ALJs will travel to a location near the beneficiary.

The VTC equipment for each of the HHS OMHA hearing rooms has been specified and the order has been placed against an existing contract. Costs are being finalized for the digital audio recorders, microphones and speakers. The estimated delivery timeframe from time of placement of order to installation is two weeks. Delivery and installation will occur on time for hearings to be held via VTC in all Office of Medicare Hearings and Appeals (OMHA) locations starting July 1. Construction requirements for cabling were previously given to the general contractors to assure that the core drills in the floors and the other wiring and cabling would be incorporated into the construction schedule in the appropriate location. Installers have been hired for each location to assure the VTC equipment is properly installed. Training for the staff on the use of VTC equipment will be provided.

We have identified VTC resources available from HHS, SSA, local government, and vendors, and are establishing relationships and procedures for utilization of VTC. We anticipate the first hearings will occur in the latter part of July 2005 (as the typical amount of time it takes to schedule a hearing is 30 days after it arrives) and we are on target to have a broad range of VTC resources available to the OMHA Field Offices. We anticipate continuing to build the VTC network of resources over the first year of operation, expanding the access to appellants even further. Feedback from SSA on their implementation of VTC also supports user acceptance of VTC for use in hearings.

HHS privacy officials were involved in the specifications of the VTC equipment and the encryption for compliance with the Privacy Act. Additionally the Department's IT and VTC experts were involved in the specification of the equipment with privacy as an essential criteria. Just as computers all 'talk' to each other, VTC also has standardized platforms that allow any VTC equipment to talk to any other VTC equipment. HHS has been in contact with VTC providers and has verified that VTC services at these sites are regularly used for depositions and that these providers have private rooms and secured networks to assure privacy.

4

All HHS VTC hearing rooms have fax and document camera capabilities, enabling appellants and/or their representatives to send and receive documents with appropriate privacy, in accordance with applicable federal laws. Additionally, MMA substantially restricted the submission of new evidence at the ALJ level of hearing.

Just as HHS is implementing policies and procedures to ensure that all reasonable accommodations are made for in-person hearings, HHS is also taking steps to ensure that all reasonable accommodations are made to ensure equal access for individuals with disabilities using VTC services. SSA data are not available on the exact number of disabled appellants; however, we do know that approximately 15% of all Medicare recipients are disabled. Accordingly, given the small beneficiary appellant population, HHS anticipates that less than 1% of all ALJ cases may require accommodation for disability. HHS's Office of Medicare Hearings and Appeals (OMHA) has the flexibility within its structure and processes to accommodate this number of cases in formats other than VTC, if appropriate. For those few individuals with physical disabilities, HHS field staff will be trained to work with appellants and/or their representatives to remove any physical barriers to accessing VTC locations. If physically accessible VTC sites and services cannot be located for the appellant, arrangements may be made for either HHS staff to travel to appellant's location to conduct the hearing or the appellant to travel to a location where an in-person hearing may be held.

The appellant will retain a copy of what they submit for the hearing and be advised by OMHA as to which components will be included in the official record for the hearing. If new information has been added to the record, that information will be provided to the appellant. If there is any question regarding what evidence is included in the record being considered by the judge, materials will be faxed or otherwise provided to the appellant.

The VTC equipment includes not only the capability to transmit the picture and sound of the video teleconference, but also state-of-the-art digital audio recording capability, with automatic back up recordings of the hearings into the local server. This surpasses the past practice of audio recordings, which were frequently not backed-up and often lost or misplaced, causing a significant remand and rework workload.

We are pleased that SSA has committed to giving us the sufficient hearing space and resources to accommodate 9,000 2-hour hearings and look forward to completing an agreement with SSA regarding the use of their VTC resources. Making SSA VTC equipment available on a consistent schedule to HHS is a central part of the transition plan, especially during the first year of operation. SSA has continued to assure us they wish to cooperate in supporting geographic availability of their VTC equipment. When we receive the blocks of available times for the locations SSA has provided in their response, we will be able to

5

better determine the extent to which SSA's infrastructure will be of use to HHS. The ability to use what SSA offers depends upon the extent to which SSA has made locations available based on the ratio of cases in that area, and what blocks of time during the day their VTC equipment will be made available to HHS. SSA VTC equipment was always envisioned to be just one of several VTC access resources for the new office. In many large cities, we have other means of VTC access via commercial vendors and HHS resources, in addition to SSA. However, we very much look forward to a signed agreement between SSA and HHS.

3: With respect to your questions regarding staffing, a copy of the organization charts for OMHA, as well as the Department are attached (Attachments 1 and 2). The case workload will be divided approximately equally among the three large OMHA Field Offices: Cleveland, Irvine, and Miami. The smaller Field Office in Arlington will have three major roles: 1) Take referral cases from the three large field offices for cases where the appellant can be represented in-person; 2) Take large, complex statistical sampling or similarly complex cases that would otherwise endanger the three large Field Offices from meeting the 90-day BIPA timeframe; and 3) Workload leveling – when one office receives a disproportionate amount of cases in a relatively short time, the Arlington Field Office will be available to help equalize the workload and allow for cases to be heard in a timely fashion. The role of the OMHA Central Office is that of any HHS central office - policy, leadership, vision, oversight, reporting, and improving processes to better address the needs of the office's internal and external customers.

The administrative staff and half of the ALJ's and their direct reports (lawyer, paralegal and hearing clerk) will be hired and begin training in mid-June. The remaining half of the ALJs and their direct reports will be hired and begin training toward the end of July. This two-phased hiring plan is based on the commitment from SSA that HHS will not inherit a pending workload from SSA. The workload therefore steadily increases from zero percent of full workload the morning of July 1, 2005 to 100% workload 90 days later (September 30, 2005) – one full cycle for processing cases. During the first half of the 90-day cycle of case processing, only half of the staff are necessary to process the cases received. Therefore, the second half of the staff will be trained and begin hearing cases approximately half way through the 90 day cycle. This two-phase hiring plan allows for staff to be trained, be available to hear cases, and appropriately uses taxpayer dollars to align the hiring of staff with the need to begin hearing cases.

All position descriptions and vacancy announcements have been written and position descriptions have been classified. All positions are either currently posted or have been posted and are closed, with the exception of two Central Office positions that are being finalized. HHS is following Executive Branch hiring rules, which require processes that take time. Nevertheless, we have made major strides in creating and staffing a new function of this size and scope

6

of OMHA. It is crucial to our success that OMHA have SSA's continued support for quick release dates and timely approval of release of judges.

To date offers have been extended and accepted for the following key positions:
1. Managing ALJs (MALJ) for the three large field offices (Cleveland, Irvine, Miami)
2. Hearing Office Managers GS-15 (Irvine, Cleveland)
3. (2) Central Office Program Managers GS-14 [currently in the Office of Medicare Hearings and Appeals Transition (OMHAT)]
4. Central Office Executive Director position (currently in OMHAT)

The following positions have been posted and closed and candidates are being interviewed for start dates for either the June or July training session:
1. Supervisory ALJs – sitting AL-3s
2. Supervisory ALJs – new judges on OPM register
3. Hearing Office Managers – GS-15s (Miami and Rosslyn)

The following position has been posted and closed and certificates are being prepared:
1. Program Analyst GS-14

The following Field Office positions are currently posted and certificates will be provided to the MALJs upon closing and HR preparation of the certs.
1. Attorney Advisor GS-12
2. Senior Attorney Advisor GS-14
3. Paralegal GS-11
4. Legal Assistant (Hearing Clerk) GS-8
5. Legal Assistant (Docket Clerk) GS-7
6. Office Automation Assistant GS-6
7. Staff Assistant GS-12

4: With respect to your questions regarding the issue of judges being given supervisory authority over their staff, there is a very strong reason why HHS made the decision to give judges this authority, especially in light of Section 521 of BIPA, pursuant to which an ALJ must issue a decision on an appeal of a reconsideration by a QIC within 90 days of receipt of a timely filed request for hearing.

The judges are required to comply with the 90-day timeframe of the law. To give them that responsibility required, in our judgment, that they possess the full authority to carry out the work . Asking a judge to comply with this legislation requires that HHS hear all cases coming from a QIC in less than ¼ of the time on average that SSA heard a case (some SSA cases took over 750 days). Granting no direct supervisory control over those staff who could allow or prevent the judge from meeting the law's time frames was not an option. The system was designed to minimize the administrative burden on the judges, while providing

7

them the authority they require to comply with the legislated timeframes. The administrative staff of each Field Office is there to ease the administrative burden on the judges.

We believe that the burden and time for an individual judge to supervise this small number of staff will not be significantly different than what current judges in SSA encounter. In SSA, just as in HHS, judges work closely with those who support them in preparing their cases, so the time difference should be negligible. Minimal time will additionally be spent in personnel matters or other supervisory responsibilities. This time commitment was considered when setting the staffing levels for the Office.

The organizational chart and details of the numbers of positions were provided in response to question 3 above, as was the hiring process. The three ALJ PDs are provided in Attachments 3, 4 and 5.

5: With respect to your questions regarding training, all new staff will receive two-weeks of instructor-led training. In addition, new administrative law judges will receive special training. We are working with the National Judicial College to conduct their course for new Administrative Law Judges exclusively for HHS new judges in a timeframe to meet our training needs.

HHS University has been developing the curriculum for several months. For every position, not just for current judges or new judges, the skills needed have been identified. Existing training resources have been matched against these training needs and the missing training needs have been identified. The approximate time blocks of the agenda have been identified, as has the target audience for each content area. Where web-based training is available and appropriate, it will be used. We are working with faculty to identify final content, obtain handouts and PowerPoint presentations so they can be duplicated and distributed to the training sites the week prior to the June training. HHS University, with their contractor, has located computer-training rooms at each of the four training locations for the hands-on computer training required for the electronic record tracking system, the Medicare Appeals System (MAS). They have also located training space for the standard classroom training. HHS University and contractors have been instrumental in the success of this significant undertaking. We also have developed training to ensure that the training needs of Managing Administrative Law Judges in each of the four field locations are met.

The majority of the training will be conducted prior to the staff's start date to hear cases and some training will most appropriately be done during the first month of work via self-instructional materials. As mentioned earlier, the training will be conducted on two occasions, in each of the four locations, to support the two-phase hiring schedule. The first training for the first half of the hearing staff will be in June; the second session in July/August. The new judge training

8

conducted by the National Judicial College will be in early July.  The second training will follow such that the remaining staff can be trained and ready to hear cases by August 7th.  Some limited  Central Office training has already started for the staff who are on board, as they currently work for OMHAT and are extensively involved in the training, MAS development and other significant issues associated with the operation of OMHA.  Because of the small number of Central Office staff and their immediate need for training, their knowledge base will already be quite high when the formal training is provided in June.  They will also attend the training offered to the Arlington Field Office staff to assure they are thoroughly familiar with the work of the Field Offices.

6: With respect to your request for a briefing on sub-regulatory policies and contingencies, the Department has contacted your staff to offer a briefing in these areas, as requested.

In conclusion, this new function is being established in an extraordinarily short timeframe relative to the government's usual timeframes for leasing space, furnishing space, creating organizations and staffing them, establishing policies, obtaining IT systems, training staff, etc.  In spite of the daunting timeframe and scope of this initiative, the Inter- and Intra-Departmental staff support, cooperation, and commitment have risen to meet the challenge.  The Department of Health and Human Services will open the new Office of Medicare Hearings and Appeals on July 1, 2005 and begin hearing Part A and Part B cases, followed by Part C cases on September 1, 2005.  We are on schedule to begin processing cases the earliest possible time allowed by the MMA legislation.

9

Attachment 1

## OFFICE OF MEDICARE HEARINGS AND APPEALS FISCAL YEAR 2005

**THE OFFICE OF MEDICARE HEARINGS AND APPEALS IMMEDIATE OFFICE**

Chief Administrative Law Judge

Chief Executive Officer

**MEDICARE HEARINGS AND APPEALS MID-ATLANTIC FIELD OFFICE**

Managing Administrative Law Judge

Hearing Office Manager

**MEDICARE HEARINGS AND APPEALS MIDWESTERN FIELD OFFICE**

Managing Administrative Law Judge

Hearing Office Manager

**MEDICARE HEARINGS AND APPEALS WESTERN FIELD OFFICE**

Managing Administrative Law Judge

Hearing Office Manager

**MEDICARE HEARINGS AND APPEALS SOUTHERN FIELD OFFICE**

Managing Administrative Law Judge

Hearing Office Manager

# DRAFT

Attachment 2

## Proposed HHS Org Chart



1

## Chief Administrative Law Judge AL-1
## (Director, Medicare Hearings and Appeals)

### I. Location of Position in Agency Organization

The position is located in the Headquarters Office, Office of Medicare Hearings and Appeals (OMHA), Office of the Secretary, Department of Health and Human Services (DHHS), in the metropolitan area of Washington, DC.

### II. Functions

The Medicare Prescription Drug, Improvement and Modernization Act of 2003 (MMA) (Public Law No. 108-173, 117 Stat. 2066 (2003)) transferred the responsibility for hearing Medicare claims cases from the Social Security Administration to DHHS. The Act established the Office of Medicare Hearings and Appeals. This office will be organizationally and functionally separate from the Center for Medicare and Medicaid Services and will be under the general supervision of the Secretary of the Department of Health and Human Services.

For Part A and Part B, the Medicare provider, supplier or beneficiary may submit an appeal through a five level appeal process: Level 1-Carrier Redetermination/Review; Level 2-Qualified Independent Contractor (QIC) Reconsideration/Carrier Hearing; Level 3-Administrative Law Judge (ALJ) Hearing; Level 4-Medicare Appeals Council (MAC), Departmental Appeals Board; and, Level–5 Federal District Court.

For Parts C and D the Medicare provider, supplier or beneficiary may submit an appeal through the following five level appeal process: Level 1-Organization determination, Level 2- Medicare Advantage Organization reconsideration/Prescription Drug Plan sponsor re-determination, Level 3-Independent Review Entity reconsideration, Level 4-ALJ appeal; and, Level 5-MAC review.

The Chief Administrative Law Judge (CALJ) manages the overall operations of the Office of Medicare Hearings and Appeals. OHMA is comprised of a Headquarters Office and several field offices. As the CALJ, the incumbent has oversight responsibilities for all Part A and Part B Level 3 reviews and Part C and Part D Level 4 reviews assigned to OMHA. He or she has overall responsibility for all adjudicatory hearings under section 205 (b) of the Social Security Act (42 U.S.C. 405(b)) relative to Medicare Part A and B claims for hospital and supplemental insurance benefits under section 1869(b) (1) of the Social Security Act (42 U.S.C. 1395ff(b)(1)); Part C for Medicare Advantage coverage determinations under section 1852(g)(5) (42 U.S.C. 1395w-22)(g)(5); and Part D for the Medicare Prescription Drug Benefit under section 1860D-4(h)(1). The CALJ ensures adherence to statutory procedures including Part A and B time limits (regulations, currently under final review, allow 90 days) and other procedural requirements of

2

the Administrative Procedure Act, Medicare laws and applicable Department of Health and Human Service regulations. He or she makes decisions that foster the expeditious processing of all cases.

The CALJ ensures all OMHA Administrative Law Judges have the ability and resources to conduct impartial hearings and are empowered to make decisions that are bound only by applicable statutes, regulations, and rulings issued in accordance with subchapter II of chapter 5, and chapter 7, of title 5, United States Code (commonly known as the 'Administrative Procedures Act'); ensuring fair and impartial rights to Medicare appellants. All OMHA ALJs operate independent of agency influence or pressure and are not supervised.

## III. **Major Duties and Responsibilities**

A. Using the guidance provided by the law and Federal and HHS regulations, the Chief Administrative Law Judge (CALJ) is responsible for providing the professional guidance and executive leadership necessary to assure the thorough, yet most expeditious, processing of all Medicare claims hearing requests filed with the OMHA.

B. The Director OMHA is responsible for creating a fully electronic hearing office and assuring that all staff hired are willing and able to operate in that environment. The Director is responsible for education and technology to support a fully electronic hearing office as the technology becomes available. The CALJ leads the OMHA day-to-day operations and oversees the development of OMHA policies and standard operating procedures. The CALJ is accountable for the organization's overall performance. He or she sets the workforce's expected performance level consistent with statutory timeframes and other regulatory mandates.

C. The CALJ is responsible for all hearing activities pertaining to those cases coming under the jurisdiction of OMHA. He or she ensures all OMHA hearing proceedings are conducted in accordance with procedural requirements of the Administrative Procedure Act and applicable Federal laws and Departmental regulations. The incumbent is responsible for ensuring field office operations are consistent with OMHA's Quality Assurance Surveillance Plan. The CALJ ensures cases are assigned to OMHA ALJs in rotation to the extent practical.

D. The CALJ is responsible for designing, developing and implementing strategies that will maximize the effective use of human resources, financial assets and technology to deliver quality Medicare claims hearings. He or she is responsible for maintaining a work environment that is safe, healthy and culturally diverse. The incumbent works diligently to ensure all employees are provided with the tools and developmental opportunities to develop their professional skills in order to maximize each staff member's ability to contribute to the achievement of OMHA's organizational goals and objectives.

E. The CALJ has full budgetary authority for the formulation and execution of OMHA's annual

3

operating budget. He or she is charged with the ongoing evaluation of staffing requirements, constantly assessing the current and future staffing needs of each of the field offices. The incumbent takes the necessary actions to adjust staffing levels to meet organizational priorities and to accommodate shifting workloads. He or she anticipates the need for new or enhanced technological solutions and acquires essential technology to efficiently and cost-effectively meet OMHA management information requirements as well as case tracking requirements.

F. The incumbent ensures the timely completion of annual performance appraisals for non-ALJ staff and takes the necessary steps to recognize employees appropriately when performance standards are exceeded. He or she initiates appropriate action when performance improvement is required. The CALJ oversees and evaluates the performance of the headquarters support staff in carrying out applicable personnel management regulations and procedures governing staffing, hiring, employment practices, retention, disciplinary actions, labor-management relations and equal employment opportunity for all employees assigned to the field offices.

G. The CALJ is responsible for ensuring OMHA's organizational structure and business processes fully support the conducting of effective, efficient and productive hearings. He or she is responsible for resolving differences among OMHA judges and serves at the final source of technical guidance. The CALJ may hear some of the most difficult or sensitive cases.

## IV. Scope and Effect of Work

The Chief Administrative Law Judge (Director, Medicare Hearings and Appeals) directs the national Office of Medicare Hearing and Appeals business and judicial functions for the Department. Decisions rendered by the CALJ impact work processes of the legal and administrative staffs of the Office of Medicare Hearing and Appeals, the Department of Health and Human Services as well as beneficiaries and health care providers throughout the United States.

The Medicare Hearing and Appeals functions directly involve the national interest, are subject to continual or intense congressional and media scrutiny and have pervasive impact on the general public. The CALJ is tasked with developing, issuing, and implementing policies, regulations, and other guidance that meets the statutory provision under the 'Fair And Impartial Rights (FAIR) for Medicare Act of 2003'.

Although the CALJ does not adjudicate fraud, rulings and policies and procedures promulgated may impact Carriers as well as U.S. Attorneys in appeals involving suspected fraudulent claims. ALJ rulings may influence policies of DHHS and CMS procedures as Medicare claims continue to become more complex and costly.

## V. Supervision and Guidance Received

4

The CALJ (Director, Medicare Hearings and Appeals), reports to the Office of the Secretary, and shall not report to, another officer of the Department of Health and Human Services.

This cabinet-level reporting relationship requires exceptional coordination and integration of very important and complex programs that include legal, medical, financial and other professional, and administrative business processes that require the incumbent to make major decisions and take precedent setting actions. Decisions and rulings made by the CALJ have a direct and substantial effect on the Medicare program and its beneficiaries. The CALJ makes recommendations and/or final decisions about many significant internal and external program and policy issues, such as those involving political and economic conditions, as well as restructuring, immediate and long range goals, objectives, plans, and schedules to meet substantial changes in legislation, program authority, and/or funding.

The CALJ may be required to conduct impartial de novo hearings and when doing so is bound only by applicable statutes, regulations, and rulings when issuing decisions. Decisions are rendered with complete autonomy and the CALJ is exempt from performance appraisal, and may be removed only for good cause as determined in a hearing on the record before the Merit System Protection Board.

## VI. **Mental Demands**

The Chief Administrative Law Judge (Director Medicare Hearings and Appeals) provides comprehensive review of cases in anticipation of complex issues which may affect timely adjudication. Broad legal knowledge as well as knowledge of the varying statutes associated with the Medicare program and the medical profession are required to make case assignments and to provide guidance to ALJs and staff.

The work requires analysis of interrelated issues of effectiveness, efficiency, and productivity of substantive mission-oriented programs. Decisions about how to proceed in planning and organizing the work of the Office is complicated by conflicting program goals and objectives which may derive from changes in legislative or regulatory guidelines, productivity, and/or variations in the demand for program services. Options, recommendations, and conclusions developed take into account and give appropriate weight to uncertainties about data and other variables that affect long-range program performance.

In rare instances, the Director hears cases. As an adjudicator, the cases assigned often involve problems such as lack of precedent, interpretation of language, which is not clearly defined or definable, and conflicting expert opinion. The cases may involve significant areas of judgment, such as judgment of reasonableness or adequacy of records, as well as highly technical medical issues. While the essence of the Administrative Law Judge program is to insulate the judges from political pressures, cases are sometimes of such political sensitivity as to place an extra burden

5

on the incumbent in terms of the scrutiny decisions will receive.

## VII.  Personal Work Contacts

In the conduct of appeals, the CALJ will regularly interact with judges, legal staff, attorneys, experts in medical and health professions, and others who may appear as witnesses. The Chief Judge will also have contact with the Secretary and his/her immediate office staff, CMS and MAC staff, operating officials at all levels within the Department, the Press, and the general public.

The CALJ represents the Department in national forums and meetings as a Departmental Expert in Medicare Appeals issues.

He or she works with Qualified Independent Contractors (QIC), the Independent Review Entities, and the Departmental Appeals Board, Medicare Appeals Council to ensure their collective efforts support mutual interests relative to the overall hearings and appeals function.

## VIII.  Travel

The CALJ is required to travel occasionally, primarily to visit field operations sites.

1

Attachment 4

**Managing Administrative Law Judge AL-2**

## I. Location of Position in Agency Organization

The position is located in the Field Office, Office of Medicare Hearings and Appeals (OMHA),
Office of the Secretary, Department of Health and Human Services (DHHS). The incumbent
reports to the Chief Administrative Law Judge (Director, Medicare Hearings and Appeals).
OMHA field offices are located in Irvine, CA, Miami, FL, Cleveland, OH and Arlington, VA.

## II. Functions

The Medicare Prescription Drug, Improvement and Modernization Act of 2003 (MMA) (Public
Law No. 108-173, 117 Stat. 2066 (2003)) transferred the responsibility for hearing Medicare
claims cases from the Social Security Administration to DHHS. The Act established the Office
of Medicare Hearings and Appeals. This office will be organizationally and functionally separate
from the Center for Medicare and Medicaid Services (CMS) and will be under the general
supervision of the Secretary of the Department of Health and Human Services.

For Parts A and B, the Medicare provider, supplier or beneficiary may submit an appeal through
a five level appeal process: Level 1-Carrier Redetermination/Review; Level 2-Qualified
Independent Contractor (QIC) Reconsideration/Carrier Hearing; Level 3-Administrative Law
Judge (ALJ) Hearing; Level 4-Medicare Appeals Council (MAC), Departmental Appeals Board;
and, Level-5 Federal District Court.

For Parts C and D, the Medicare provider, supplier or beneficiary may submit an appeal through
the following five level appeals process: Level 1-Organization determination, Level 2- Medicare
Advantage Organization reconsideration/Prescription Drug Plan sponsor redetermination, Level
3-Independent Review Entity Reconsideration, Level 4-ALJ hearing; and, Level 5-MAC review.

The incumbent Managing ALJ (MALJ) manages the day to day operations of a field office. He or
she will be responsible for leading a fully electronic, state of the art, hearing office function,
ensuring the education and technology necessary to assure success are provided.

As the Managing Administrative Law Judge for a field office, he or she has oversight
responsibilities for all Part A and B Level 3 reviews and all Part C and D Level 4 reviews
assigned to the field office. ALJs conduct adjudicatory hearings under section 205 (b) of the
Social Security Act (42 U.S.C. 405(b)) relative to Medicare Part A and B claims for hospital and
supplemental insurance benefits under section 1869(b) (1) of the Social Security Act (42 U.S.C.
1395ff(b)(1)); Part C for Medicare Advantage coverage determinations under section 1852(g)(5)

2

(42 U.S.C. 1395w-22)(g)(5); and Part D for the Medicare Prescription Drug Benefit under section 1860D-4(h)(1).

The MALJ monitors the hearing process to ensure adherence to statutory procedures including the Part A and B time limits (regulations, currently under final review, allow 90 days) and other procedural requirements of the Administrative Procedure Act, Medicare laws and applicable Department of Health and Human Services regulations. He or she makes recommendations to ensure expeditious processing of all cases. The incumbent will perform professional work related to the conduct of adjudicative hearings and the disposition of cases arising under the aforesaid statutes.

As the MALJ, he or she ensures all Administrative Law Judges assigned to his or her field office have the ability and resources to conduct impartial hearings and are empowered to make decisions that are bound only by applicable statutes, regulations, and rulings issued in accordance with subchapter II of chapter 5, and chapter 7, of title 5, United States Code (commonly known as the 'Administrative Procedures Act'); ensuring fair and impartial rights to Medicare appellants. All OMHA ALJs operate independent of agency influence or pressure and are not supervised.

## III. Major Duties and Responsibilities

A. Under the general administrative direction of the Chief Administrative Law Judge (CALJ), the MALJ is responsible for providing the administrative guidance and leadership necessary to assure the thorough, yet most expeditious, processing of all Medicare hearing requests filed with the OMHA. Specific responsibilities of the MALJ include, but are not limited to:

    1. Plans, directs and coordinates the hearings activities for all cases coming under the jurisdiction of his or her field office.

    2. Manages the maintenance of a control system to monitor status of all cases and provides statistical reports on the status of those cases. Charged with ensuring field office staff foster the continuous improvement of business processes and workflows and enhance the use of enabling technologies to operate successfully in a fully electronic, paperless hearing office.

    3. Assigns cases, in rotation to the extent practicable, to individual ALJs assigned to the field office.

    4. Plans, develops, directs, coordinates and evaluates the professional functions incidental to the hearings process.

    5. Assures that hearing proceedings conducted by the field office are in accord with

3

procedural requirements of the Administrative Procedure Act and applicable Federal laws and Department of Health and Human Services regulations.

6. Monitors the status of pending cases and recommends reasonable standards of quality, output, and productivity to assure the timely and expeditious processing of those cases to meet the Part A and B 90 day mandatory timeframes.

7. Supervises non-ALJ direct reports. Ensures all non-ALJ staff members are provided with annual performance plans and receive meaningful, timely performance appraisals. Takes the necessary steps to recognize employees appropriately when performance standards are exceeded. Initiates appropriate action when performance improvement is required. Oversees and evaluates the performance of the Hearing Office Manager in carrying out applicable personnel management regulations and procedures governing staffing, employment, retention, disciplinary actions, labor-management relations and equal employment opportunity for all employees assigned to the field office.

8. Recommends to the CALJ annual budget requests and justifications for personnel, equipment, facilities, travel, transcript, supplies and training necessary for the day to day operations of the field office.

9. Provides advice and assistance to the CALJ in preparing or reviewing testimony, budgetary analyses, statements, and other materials prepared for presentation by the CALJ in connection with Departmental or Congressional requests, often on an expedited basis.

10. Provides overall direction for the formulation, promulgation and evaluation of the policies and procedures necessary for the operation of the field office's hearing process.

11. Recommends to the CALJ which ALJs are to be hired from the civil service register, transferred from other agencies, or reassigned within the OMHA. The incumbent makes recommendations related to the approval or disapproval of requests from ALJs to participate in outside activities. Recommends to the CALJ any adverse personnel actions against ALJs.

12. Presides at hearings in some of the most difficult and controversial proceedings; developing the record in such proceedings from oral testimony and documentary evidence; independently studying and analyzing the evidence; and preparing decisions containing findings of fact, supporting rationale, conclusions of law, and resolution of the appeal.

## IV. Scope and Effect of Work

The MALJ provides general administrative direction for the other ALJs in the field office, provides line supervision for the Hearing Office Manager and field office support staff. Provides

4

secondary supervision for ALJ support staff.

The MALJ ensures that cases are processed expeditiously, while recognizing the individual ALJ's responsibility to handle his/her cases independently and in an impartial manner. The incumbent is a member of the OMHA executive team and participates in establishing OMHA organizational goals and objectives.

Cases assigned to the field office involve difficult, complex, and conflicting legal questions or factual issues. Individual cases may have substantial impact on activities of the Department and the health care provider communities. Parties to all cases must be scrupulously assured that hearings are conducted in an impartial manner.

The incumbent's role as an ALJ responsible for conducting administrative proceedings is functionally comparable to that of a trial judge of a court of record.


## V.  Supervision and Guidance Received

The MALJ functions under the broad administrative direction of the CALJ and receives general guidance from the CALJ relative to organizational management issues. He or she receives no supervision relative to hearing cases or rendering decision. The incumbent as such shares the responsibility for the success of the hearings process conducted by the field office.


## VI.  Mental Demands

The MALJ must exercise a high degree of executive ability, legal talent, judicial temperament, discretion and specialized experience with administrative law. He or she must possess broad legal knowledge and have sufficient knowledge of the programs administered by the Department to understand technical, legal and factual issues likely to be encountered in the cases assigned to the Office. He or she must be able to provide upon request by the ALJs and others, substantive, technical, and procedural guidance for the expeditious processing of pending cases. Like other ALJs, the incumbent must possess excellent analytical, decision-making and writing ability, and must be able to control administrative hearing proceedings at all times no matter how trying the circumstances, and whether caused by recalcitrant counsel, witnesses, or otherwise. The MALJ must maintain the highest standards of professional practices and ethics.


## VII.  Personal Work Contacts

The MALJ communicates regularly with and works in harmony with other field offices in the OMHA. Frequent contact with other ALJs and support staff is required in the assigning and

5

monitoring of cases. Interacts with national organizations and federal agencies and departments to exchange information on experiences and methods, and to promote better understanding of the hearings process.

## VIII. <u>Travel</u>

The incumbent MALJ may be required to travel regularly to hearing sites. Travel requirements may be reduced in the future as technology solutions are introduced with OMHA to conduct hearing by video conference. Incumbent may also be required to travel to meet with other leadership in the ALJ function.

1

### Supervisory Administrative Law Judge – AL-3

## I. Location of the Position in Agency Organization

The position is located in the Field Office, Office of Medicare Hearings and Appeals (OMHA), Office of the Secretary; Department of Health and Human Services (DHHS). The incumbent reports to the OMHA ALJ responsible for managing the field office. OMHA field offices are located in Irvine, CA, Miami, FL, Cleveland, OH and Arlington, VA.

## II. Functions

The Medicare Prescription Drug, Improvement and Modernization Act of 2003 (MMA) (Public Law No. 108-173, 117 Stat. 2066 (2003)) transferred the responsibility for hearing Medicare claims cases from the Social Security Administration to DHHS. The Act established the Office of Medicare Hearings and Appeals. This office will be organizationally and functionally separate from the Center for Medicare and Medicaid Services (CMS) and will be under the general supervision of the Office of the Secretary of the Department of Health and Human Services.

For Part A and Part B, the Medicare provider, supplier or beneficiary may submit an appeal through a five level appeal process: Level 1-Carrier Redetermination/Review; Level 2-Qualified Independent Contractor (QIC) Reconsideration/Carrier Hearing; Level 3-Administrative Law Judge (ALJ) Hearing; Level 4-Medicare Appeals Council (MAC), Departmental Appeals Board; and, Level–5 Federal District Court.

For Parts C and D, the Medicare provider, supplier or beneficiary may submit an appeal through the following five level appeals process: Level 1-Organization determination, Level 2- Medicare Advantage Organization reconsideration/Prescription Drug Plan sponsor redetermination, Level 3-Independent Review Entity Reconsideration, Level 4-ALJ hearing; and, Level 5-MAC review.

As the Part A and Part B Level 3 reviewer and the Part C and Part D Level 4 reviewer, the Supervisory Administrative Law Judge (ALJ) conducts adjudicatory hearings under section 205 (b) of the Social Security Act (42 U.S.C. 405(b)) relative to Medicare Part A and B claims for hospital and supplemental insurance benefits under section 1869(b) (1) of the Social Security Act (42 U.S.C. 1395ff(b)(1)); Part C for Medicare Advantage coverage determinations under section 1852(g)(5) (42 U.S.C. 1395w-22)(g)(5); and Part D for the Medicare Prescription Drug Benefit under section 1860D-4(h)(1).

The ALJ monitors and ensures adherence to statutory procedures including Part A and Part B time limits (regulations, currently under final review, allow 90 days) and other procedural requirements of the Administrative Procedure Act, Medicare laws and applicable Department of

2

Health and Human Service regulations. The ALJ makes recommendations to OMHA leadership to ensure expeditious processing of all cases. The incumbent will perform professional work related to the conduct of adjudicative hearings and the disposition of cases arising under the aforesaid statutes.

The ALJ is an impartial decision maker; bound only by applicable statutes, regulations, and rulings issued in accordance with subchapter II of chapter 5, and chapter 7, of title 5, United States Code (commonly known as the "Administrative Procedures Act"); ensuring fair and impartial rights to Medicare appellants. All OMHA ALJs operate independent of agency influence or pressure and are not supervised.

## III.  Duties and Responsibilities

The incumbent performs as an administrative trial judge in conducting the formal proceedings described above. He or she will be responsible for leading and supervising his or her staff's efforts to become a fully electronic, state of the art, hearing office function, ensuring the education and technology necessary to assure success are provided.

In general, the normal duties and responsibilities of the position are to conduct a fair hearing, avoid delay, maintain order, assure that an adequate record of the proceeding is made, and produce a well-reasoned and well-written decision. The incumbent is authorized to:

- Administer oaths and affirmations;

- Issue subpoenas;

- Receive, rule on, exclude, or limit evidence;

- Regulate the course of the hearing and the conduct of counsel, and in appropriate cases and as authorized by law, sanction parties and/or their counsel for misconduct;

- Upon request of a party, allow the party to inspect and copy documents relevant to the issues in the proceeding that are in the possession or control of the other party;

- Hold conferences to identify or simplify the issues, or to consider other matters that may aid in the expeditious disposition of the proceeding;

- Rule on motions and other procedural matters;

- Examine witnesses;

- Continue or recess the hearing in whole or in part;

3

·       Change the date, time, and the place of the hearing, upon notice to the parties;

·       Upon motion of a party, decide cases, in whole or in part, by summary judgment where there is no disputed issue of material fact.

In short, the incumbent functions and is classified as a judge under the Administrative Procedure Act. When hearings are conducted, a complete formal record of the hearing is regularly prepared, and formal written decisions are issued.

The ALJ supervises his or her direct support staff usually comprised of a lawyer, a paralegal and a hearing clerk to ensure statutory and regulatory timeframes are met. He or she hires staff, monitors and evaluates staff performance and ensures compliance with EEO and merit principles.

The ALJ ensures his or her staff functions at a high level of performance and share a common vision for providing quality services. The incumbent and his or her staff work with other members of the OMHA staff to foster the continuous improvement of business processes and workflows and enhance the use of enabling technologies to operate successfully in a fully electronic hearing office.

In addition, with the approval of the Office of Personnel Management and with the consent of the Department of Health and Human Services, the incumbent ALJ may be called to another agency for the purpose of conducting formal administrative hearings before such other agency.

## IV.    Scope and Effect of Work

The decisions of the incumbent have an important bearing in molding the policies of the Department of Health and Human Services. The decisions of the incumbent also may have a broad bearing on curbing and deterring fraud, waste, and abuse in the Department and its programs, particularly its health care financing programs.

The incumbent's role in conducting administrative proceedings is functionally comparable to that of a judge of a court of record, with unusual latitude for the exercise of discretion and independent judgment in the conduct of the proceedings and the determination of all issues of law and fact.

## V. Supervision and Guidance Received

By authority of the Chief Administrative Law Judge (CALJ) who serves as the Director, Medicare Hearings and Appeals, cases are generally assigned by the field office managing ALJs to each ALJ, in rotation to the extent practicable. Once assigned, the incumbent has control of the

4

case, its conduct and resulting decision. Appeals may be taken by the parties to the Medicare Appeals Council (MAC), a component of the Departmental Appeals Board, or the Federal District Court or Court of Appeals.

The ALJ conducts impartial de novo hearings and issues decisions. He or she is bound only by applicable statues, regulations, and rulings. The ALJ has complete independence of action with respect to determinations to be made in assigned cases. He or she is exempt from performance appraisal, and may be removed only for good cause as determined in a hearing on the record before the Merit System Protection Board.

There is no supervision of incumbent's judicial decisions, however, the incumbent is guided by the language of the statutes involved, the agency's rules and regulations and applicable precedent.

## VI. **Mental Demands**

The ALJ performs a range of professional and technical work that requires comprehensive knowledge of the principles and the practice of law, knowledge of the varying statutes associated with the Medicare program and the medical professional and the ability to direct research procedures leading to an adjudicative determination. Cases vary considerably. The cases assigned often involve problems such as lack of precedent, interpretation of language, which is not clearly defined or definable, and conflicting expert opinion. The cases may involve significant areas of judgment, such as judgment of reasonableness or adequacy of records, as well as highly technical issues or medical matters.

While the essence of the Administrative Law Judge program is to insulate the judges from political pressures, cases are sometimes of such political sensitivity as to place an extra burden on the incumbent in terms of the scrutiny decisions will receive.

## VII. **Personal Work Contacts**

In addition to daily contact with his or her support staff, in the conduct of appeals, the ALJ may interact with other ALJ's, outside attorneys, experts from the medical and health professions, and others who may appear as witnesses. The incumbent will preside at hearings at which health professionals appear as witnesses. The incumbent's contacts include attorney's representatives, health, other social services professionals and, OMHA staff.

## VIII. **Travel**

The incumbent may expect to travel regularly to conduct hearings. The travel requirement may

5

be reduced as OMHA implements the increased use of video-conferencing and audio-conferencing to conduct hearings, as a fully electronic hearing office.



THE SECRETARY OF HEALTH AND HUMAN SERVICES
WASHINGTON, D.C. 20201

AUG - 9 2005

The Honorable Harold Ford
House of Representatives
Washington, DC 20515-2108

Dear Congressman Ford:

Thank you for your letter regarding the transition of responsibility for hearing Medicare appeals from the Social Security Administration (SSA) to the Department of Health and Human Services (HHS). On July 1, 2005, the Office of Medicare Hearings and Appeals (OMHA), within HHS, successfully opened its doors and began receiving third level Medicare appeals. Over the next three months OMHA will work with SSA to ensure a seamless transition.

Please be assured that HHS is not closing or consolidating any SSA offices. All 140 SSA offices will remain open for disability hearings. HHS has created a regional structure to streamline the case resolution process and enable OMHA to resolve cases in a more timely fashion. Four regional offices were opened and are supported by the larger HHS infrastructure, which includes 10 regional offices. The HHS strategy provides appellants the option to receive a video teleconference hearing (VTC), a telephone hearing, or an in-person hearing, depending on the needs of the individual appellant. Beneficiaries without representation constitute less than 5% of total hearings, whereas the remaining 95% are providers or other appellants who will be more at ease with VTC technology and may see this as an opportunity to quickly resolve the claim.

SSA has been slowly increasing its use of VTC hearings for Medicare appeals, and the HHS strategy builds of this growing trend. HHS has access to VTC sites in over 1,000 cities nationwide. The use of VTC technology coupled with the in-person hearings will enable HHS to conduct hearings in many more sites than SSA's current 140 locations. This cutting edge strategy is consistent with the nation's shift toward effectively utilizing technology to streamline processes and provide more effective health care.

It is important to note that the use of VTC technology does not preclude an appellant from receiving an in-person hearing. Any appellant will be granted an in-person upon the showing of good cause, including a demonstrated inability to use VTC equipment. To further meet individual needs OMHA judges will travel to conduct in-person hearings. This will enable HHS to achieve our goal of providing hearings that are in close proximity to the beneficiary's home and that accommodate any special needs the beneficiary has, just as SSA does today. HHS has made arrangements to utilize government offices and/or commercial sites around the country to conduct in-person hearings. While a beneficiary requesting an in-person hearing will waive the right to a decision in 90 days, it is our intent to hear cases in a timely fashion.

HHS will carefully monitor this initiative to ensure that Medicare beneficiaries receive fair and timely hearings, and that any special needs are met. HHS is dedicated to providing high quality, timely service. If you have any questions please do not hesitate to contact my office.

Sincerely,

Michael O. Leavitt